NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| EVEREST NATIONAL INSURANCE COMPANY, *et al.*,<br><br>               Plaintiffs,<br><br>        v.<br><br>AMERICAN CLAIMS MANAGEMENT, INC.,<br><br>               Defendant. | Civil Action No. 22-2710 (MAS) (RLS)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendant American Claims Management, Inc.'s ("Defendant" or "ACM") Partial Motion for Summary Judgment (ECF No. 104) and Plaintiffs Everest National Insurance Company and Everest Security Insurance Company's (collectively "Plaintiffs") Motion for Summary Judgment (ECF No. 130). Plaintiffs opposed Defendant's Motion (ECF No. 106) and Defendant replied (ECF No. 114). Defendant opposed Plaintiffs' Motion (ECF No. 131) and Plaintiffs replied (ECF No. 133). The Court has carefully considered the parties' submissions and reaches its decision without oral argument under Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons below, both motions are denied.

## I.     BACKGROUND

The following facts are drawn from: (1) Defendant's Statement of Undisputed Material Facts in support of its Motion for Partial Summary Judgment ("DSOF") (DSOF, ECF No. 104-2); (2) Plaintiffs' Responses and Objections to Defendant's Statement of Undisputed Material Facts ("PRSOF") (PRSOF 1-22, ECF No. 106-20); (3) Plaintiffs' Counterstatement of Material Facts

("PCOF") (PCOF 22-23, ECF No. 106-20); (4) Defendant's Response to Plaintiffs' Counterstatement of Facts ("DRCSOF") (DRCSOF, ECF No. 114-1); (5) Plaintiffs' Statement of Undisputed Material Facts in support of their Motion for Summary Judgment ("PSOF") (PSOF, ECF No. 130-2); (6) Defendant's Response to Plaintiffs' Statement of Facts ("DRSOF") (DRSOF, ECF No. 131-1); and (7) Defendant's Supplemental Statement of Material Facts ("DSSOF") (DSSOF, ECF No. 131-2). The facts are undisputed by the parties unless otherwise noted.

### A.    The Master Contract

On or about January 1, 2016, Plaintiffs and ACM entered into a Master Contract for Claim Handling and Adjusting Services (the "Master Contract"). (PSOF ¶ 1; DRSOF ¶ 1.) Pursuant to the Master Contract, ACM "serve[s] as [Plaintiffs'] claims administrator in connection with Claims and accept[s] and review[s] all submitted Claims[.]" (PSOF ¶ 2; DRSOF ¶ 2.) The Master Contract further states that "[ACM] HAS NO AUTHORITY TO DENY COVERAGE. [Plaintiffs] MUST APPROVE ALL DENIALS AT [Plaintiffs'] SOLE AND ABSOLUTE DISCRETION." (PSOF ¶ 3 (emphasis in original); DRSOF ¶ 3.) The Master Contract also contains an indemnification provision. (PSOF ¶ 7; DRSOF ¶ 7.)

This lawsuit arises out of Defendant's handling of two separate claims: (1) an auto liability claim that arose in Georgia; and (2) a workers' compensation claim that arose in Arizona. (DSOF ¶ 1; PRSOF ¶ 1.) The Master Contract applied to both claims. (PSOF ¶ 10; DRSOF ¶ 10.)

### B.    The Jervis Claim—Auto Liability

Plaintiffs issued an insurance policy (the "Policy") to Vivian Amos ("Amos") for the policy period of December 23, 2016, through June 23, 2017, with a policy limit of $25,000 per person. (DSOF ¶ 3; PRSOF ¶ 3; PSOF ¶ 11; DRSOF ¶ 11.) The Policy contained a provision that required that "an 'insured person' claiming any coverage under the [P]olicy must . . . [c]ooperate

2

with . . . and assist 'us' in any matter concerning a claim or lawsuit . . . [and] [p]rovide 'us' with any proof of 'loss,' signed statement or recorded statement, or statement under oath, that 'we' request." (DSOF ¶ 4; PRSOF ¶ 4.) On May 15, 2017, while driving his mother's car, Jonathan Amos ("Jonathan," and together with Amos, the "Amoses"), who was twenty-one years old at the time, collided with another motor vehicle in Rockdale County, Georgia. (DSOF ¶ 5; PRSOF ¶ 5; PSOF ¶ 13; DRSOF ¶ 13.) Jay Jervis ("Jervis"), who was operating a motorcycle, came upon the accident, lost control of his motorcycle and suffered personal injuries. (DSOF ¶ 6; PRSOF ¶ 6.) On May 24, 2017, Defendant, "in its role as third party administrator for [Plaintiffs], opened a file for the accident." (DSOF ¶ 7; PRSOF ¶ 7.) "A few weeks later, on June 6, 2017, [Defendant] received a call from an attorney, Samuel Crowe [('Crowe')], who represented Jervis with respect to a bodily injury claim (the 'Jervis Claim')." (DSOF ¶ 8; PRSOF ¶ 8.) Defendant investigated the details of the accident, and then Defendant's claims adjuster, "Zam Adan [('Adan')] contacted [] Crowe on August 29, 2017, conveying, among other things" that Defendant "would like to attempt to resolve the claim." (DSOF ¶ 9; PRSOF ¶ 9.)

After speaking with Crowe, Adan contacted Plaintiffs' named insured, Amos, and explained that Jervis had "sustained serious injuries, with medical bills purportedly over $1.4 million." (DSOF ¶ 10 (citation modified); PRSOF ¶ 10.) Adan explained that Defendant "would 'attempt to resolve the claim.'" (DSOF ¶ 11; PRSOF ¶ 11.) Adan documented that Amos "became 'upset' and did not believe her son was responsible for [] Jervis'[s] injuries." (DSOF ¶ 12; PRSOF ¶ 12.) Defendant responded that "even if we were to argue that [Jervis] contributed to his injuries[,] given his injuries, hospitalizations and medical bills incurred, his claim would still exceed the policy limit [of] $25,[000] we have for his claim." (DSOF ¶ 13 (citation modified); PRSOF ¶ 13.) Adan then confirmed that the Amoses did not have any other insurance policies and explained that

3

Jervis's attorney would require an affidavit of no other insurance from the Amoses to settle his claim. (DSOF ¶ 14; PRSOF ¶ 14.) That same day, Defendant sent a confirmatory e-mail message to Amos regarding Jervis's injuries and the need for an affidavit of no other insurance. (DSOF ¶ 15; PRSOF ¶ 15.) Defendant sent two affidavits of no additional insurance to Amos on October 6, 2017. (DSOF ¶ 16; PRSOF ¶ 16.) Defendant advised Amos "that given the severity of the injuries, the cases should be settled for policy limits." (DSOF ¶ 18; PRSOF ¶ 18.) Amos did not sign and return the affidavits. (DSOF ¶ 18; PRSOF ¶ 18.) "Instead, . . . Amos called ACM on October 13, 2017, spoke with two [of Defendant's] employees, and 'consistently' advised that her son was not responsible for . . . Jervis's injuries." (DSOF ¶ 19; PRSOF ¶ 19.) Defendant's "adjuster documented her" October 13, 2017, conversation with Amos "by writing 'she received the affidavits of no additional insurance sent to her and her son' but 'she has a problem with the Jervis Claim' and 'does [not] agree[] that we should address anything for [] Jervis.'" (DSOF ¶ 20 (citation modified); PRSOF ¶ 20.) Subsequently, an "ACM manager documented a follow-up conversation with [] Amos by noting" that "[s]he states she will not sign an affidavit with [] Jervis's name on it as she states the incident with the motorcycle was not related to her son's loss. I attempted to discuss, and she stated she would not sign." (DSOF ¶ 21 (citation modified); PRSOF ¶ 21.)

On February 27, 2018, although "Jervis had not yet made an actual settlement demand, . . . ACM sent an e-mail [message] with a letter to his attorney tendering the policy's limits to resolve the Jervis Claim." (DSOF ¶ 22; PRSOF ¶ 22.) Defendant, accordingly, "ordered the $25,000 policy limit settlement check and sent a draft limited release to [] Jervis's attorney." (DSOF ¶ 23; PRSOF ¶ 23.) Jervis's "attorney responded and asked [Defendant] to not issue the check" and explained "that he only wanted confirmation that 'the policy limits . . . would be offered.'" (DSOF ¶ 24; PRSOF ¶ 24.) "ACM's claims professionals thereafter followed up

with . . . Jervis's attorney regarding the policy limit tender on May 11, 2018, July 6, 2018, September 5, 2018, November 9, 2018, January 4, 2019, and February 4, 2019." (DSOF ¶ 25; PRSOF ¶ 25.)

On February 19, 2019, Jervis's "attorney sent a written settlement offer to ACM, demanding payment of the Policy's $25,000 limits, a limited liability release, and an affidavit of no additional insurance." (DSOF ¶ 26; PRSOF ¶ 26.) The settlement "demand included a [thirty]-day time limit." (DSOF ¶ 27; PRSOF ¶ 27.) Defendant received the settlement demand "letter on February 20, 2019." (DSOF ¶ 28; PRSOF ¶ 28.) "The following day, . . . an ACM claims professional left a voicemail on [] Amos's" phone "and mailed her a letter enclosing two standard affidavits of no additional insurance, requesting, in bold font, that the affidavits be signed and returned. (DSOF ¶ 29; PRSOF ¶ 29.) On February 22, 2019, "ACM emailed [] Jervis's attorney asking for his law firm's W-9 'to enter into the system so I am able to process settlement payment'" which Jervis's attorney provided the same day. (DSOF ¶¶ 30-31 (citation modified); PRSOF ¶¶ 30-31.) Also that same day, ACM sent a letter to Jervis's counsel "enclosing a $25,000 settlement check[.]" (DSOF ¶ 32; PRSOF ¶ 32.) In that same letter, ACM advised that it would "forward the affidavit of no additional insurance upon receipt from the insured." (DSOF ¶ 33; PRSOF ¶ 33.) "On Friday, March 22, 2019 (the last day of the [thirty]-day time-limited demand), an ACM-retained investigator visited . . . Amos at her residence; he documented that . . . Amos confirmed that she had already received the requested affidavit of no additional insurance 'but refused to sign it.'" (DSOF ¶ 35; PSOF ¶ 35.) On March 25, 2019, Defendant called Amos on a new phone number provided by the investigator. (DSOF ¶ 36; PRSOF ¶ 36.) Defendant documented that, during the call, Amos became "belligerent." (DSOF ¶ 37; PRSOF ¶ 37.) On April 11, 2019, Amos delivered an affidavit of no additional insurance signed by her son. (DSOF ¶ 37;

PRSOF ¶ 37.) Two days prior, Jervis and his wife (collectively, the "Jervises") filed a civil lawsuit against the Amoses (the "Jervis Lawsuit"). (DSOF ¶ 37; PRSOF ¶ 37.)

On May 10, 2019, Plaintiffs tendered the defense and indemnification for the Jervis Claim to ACM. (DSOF ¶¶ 38-39; PRSOF ¶¶ 38-39.) ACM refused to defend and indemnify Plaintiffs against the Jervis Claim and conveyed several times that it disagreed that any indemnity was owed. (DSOF ¶ 39; PRSOF ¶ 39.) "On August 29, 2019, after [Plaintiffs] had formed a belief that ACM breached the Master Contract, and after ACM had advised [Plaintiffs] 'several times' that it disagreed with [Plaintiffs'] position, [Plaintiffs] received a [thirty]-day time-limited offer to settle the Jervis Claim for $2 million." (DSOF ¶ 40 (citation modified); PRSOF ¶ 40.)

On September 9, 2019, the Amoses filed a motion to enforce the $25,000 settlement agreement in the Jervis Lawsuit. (DSOF ¶ 43; PRSOF ¶ 43.) "The Amoses argued that they, through ACM, met the terms of the Jervises' pre-complaint settlement demand and had effectuated a binding settlement." (DSOF ¶ 44; PRSOF ¶ 44.) The Georgia trial court agreed and found that the Amoses, through ACM, "consistently agreed to pay the $25,000 policy limits in order to resolve the claims before them." (DSOF ¶ 45; PRSOF ¶ 45.) "It concluded that 'the parties entered into a definite, certain, and unambiguous settlement agreement that will be enforced by this Court.'" (DSOF ¶ 46; PRSOF ¶ 46.) "As for the affidavit of no additional insurance, the Georgia trial court ruled that it 'was an act of performance of the already-accepted settlement agreement,' meaning that it had to be provided but not within the [thirty]-day time limit set forth in the demand." (DSOF ¶ 47; PROSF ¶ 47.) The Georgia Court of Appeals "subsequently disagreed with the trial court's holding that the affidavit was a condition of performance and . . . reversed the trial court's finding that the parties had reached an enforceable settlement agreement." (DSOF ¶ 48; PRSOF ¶ 48 (admitting that "the Georgia Court of Appeals found that the affidavit of no other insurance [w]as

a condition that had to have been met within the [thirty] day time limit to meet all the conditions in order to effectuate a settlement for $25,000").) "The Georgia appellate court did not reach any other arguments asserted by the parties." (DSOF ¶ 49; PRSOF ¶ 49.)

Over three years later, Plaintiffs settled the Jervis Lawsuit for $9.5 million. (DSOF ¶ 50; PRSOF ¶ 50.) "At the time of the settlement, no one had asserted a bad faith claim against Plaintiffs." (DSOF ¶ 51; PRSOF ¶ 51.) Before Plaintiffs entered into the settlement agreement, ACM, through its counsel, advised Plaintiffs to raise a safe harbor defense. (DSOF ¶ 52; PRSOF ¶ 52.) Plaintiffs did not assert such a defense. (DSOF ¶ 53; PRSOF ¶ 53.)

### C.    Garibaldi Claim—Workers' Compensation

"[Plaintiffs] insured Valley Fire and Water Restoration, Inc. ("Valley Fire") pursuant to a workers' compensation insurance policy . . . dated October 1, 2017, to October 1, 2018." (PSOF ¶ 64; DRSOF ¶ 64.) On or about November 22, 2017, Jorge Garibaldi ("Garibaldi"), an employee of Valley Fire, allegedly sustained an injury to his back as a result of lifting during the course of his employment. (PSOF ¶ 65; DRSOF ¶ 65.) "Garibaldi filed a workers' compensation claim on December 21, 2017, with Industrial Commission of Arizona" (the "ICA"). (PSOF ¶ 66; DRSOF ¶ 66.) On or about December 21, 2017, the notice of claim was sent to York Risk Services ("York"), another third-party administrator, but was then redirected to ACM as the proper third-party administrator to process this claim on behalf of Plaintiffs. (PSOF ¶ 67; DRSOF ¶ 67.) On or about February 14, 2018, ACM received the notice of claim from York, and "it was assigned to Perla Salcido [("Salcido")], a claim[s] handler with ACM." (PSOF ¶ 68; DRSOF ¶ 68.) Salcido accepted the claim on February 16, 2018, authorizing Garibaldi to receive a medical evaluation, but did not grant Garibaldi "time lost benefits." (PSOF ¶ 69; DRSOF ¶ 69.) During the end of March 2018, Garibaldi first sought medical care from Dr. Jeffrey Scott ("Dr. Scott"), who was selected by

Garibaldi or his attorney. (PSOF ¶ 70; DRSOF ¶ 70.) Dr. Scott sent Garibaldi "to physical therapy and prescribed some medication[.]" (*Id.*) Dr. Scott placed Garibaldi on an off-work status, and found that "it [was] medically reasonable that he was unable to return to work since his injury date." (*Id.*) Garibaldi was scheduled for an independent medical exam with Dr. Leon Ensalada ("Dr. Ensalada") on May 17, 2018. (PSOF ¶ 72; DRSOF ¶ 72.) "Following a review of Garibaldi's medical records and performing a physical exam, [Dr.] Ensalada determined that Garibaldi had a congenital condition not related to his workplace injury." (PSOF ¶ 73; DRSOF ¶ 73.) "As a result of this opinion, Salcido determined that Garibaldi was not entitled to any loss income benefits and closed the case effective July 9, 2018." (PSOF ¶ 74; DRSOF ¶ 74.)

Garibaldi subsequently had a hearing before the ICA regarding the denial of benefits, in which the ICA awarded Garibaldi with disability benefits from November 22, 2017, through when Garabaldi's condition stabilizes. (PSOF ¶ 75; DRSOF ¶ 75.) "On March 20, 2019, Garibaldi filed a separate action in the State of Arizona Superior Court, County of Maricopa against [Plaintiffs], ACM, and . . . [Salcido] ([the] 'Garibaldi Action')." (PSOF ¶ 76; DRSOF ¶ 76.) Garibaldi alleged four causes of action against Plaintiffs, ACM, and Salcido: "(1) breach of the duty of good faith and fair dealing"; (2) aiding and abetting Plaintiffs' breach of the duty of good faith and fair dealing as to ACM; (3) aiding and abetting Plaintiffs' breach of the duty of good faith and fair dealing as to Salcido; and (4) punitive damages. (PSOF ¶ 76; DRSOF ¶ 76.) Plaintiffs thereafter removed the action to federal court. (PSOF ¶ 76; DRSOF ¶ 76.) On April 24, 2019, Plaintiffs tendered a defense and indemnification for the Garibaldi Action to ACM. (PSOF ¶ 77; DRSOF ¶ 77.) "On or about April 25, 2019, Garibaldi and [Plaintiffs] settled Garibaldi's workers' compensation claim for $137,500." (PSOF ¶ 78; DRSOF ¶ 78.) "As part of the settlement, however, Garibaldi preserved his right to continue pursuing his bad faith action." (PSOF ¶ 78; DRSOF ¶ 78.) "Both ACM and

Salcido moved to dismiss Garibaldi's claims as to them." (PSOF ¶ 79; DRSOF ¶ 79.) The Court granted both motions. (PSOF ¶ 79; DRSOF ¶ 79.) "On October 30, 2020, Plaintiffs filed for summary judgment in the Garibaldi Action." (PSOF ¶ 80; DRSOF ¶ 80.) "On November 23, 2020, Plaintiffs advised ACM of Garibaldi's initial settlement demand offering to settle the bad faith action for $962,500." (PSOF ¶ 81; DRSOF ¶ 81.) "On November 30, 2020, ACM responded . . . denying [Plaintiffs'] tender and advising that it would not be willing to contribute any amount to any settlement reached with Garibaldi." (PSOF ¶ 82; DRSOF ¶ 82.) "On August 12, 2021, the court denied [Plaintiffs'] motion for summary judgment in its entirety." (PSOF ¶ 83; DRSOF ¶ 83.) On September 10, 2021, [Plaintiffs] wrote to ACM informing ACM of the denial of their motion for summary judgment and that the court had determined that "a reasonable jury could conclude that Plaintiffs unreasonably and improperly used the [independent medical examiner] process to 'doctor shop' and limit and cut off benefits [to Mr. Garibaldi] after July 2018." (PSOF ¶ 84; DSOF ¶ 84.) Plaintiffs retendered their defense and indemnification to ACM. (PSOF ¶ 84; DSOF ¶ 84.) Plaintiffs invited ACM to participate in a mediation with Garibaldi. (PSOF ¶ 85; DSOF ¶ 85.) "On November 30, 2021, ACM again rejected Plaintiffs' tender and advised that it would not be attending the mediation session." (PSOF ¶ 86; DSOF ¶ 86.) Following mediation, on February 22, 2022, Plaintiffs settled Garibaldi's bad faith and punitive damages claims for $595,000. (PSOF ¶ 87; DRSOF ¶ 87.) "To date, ACM has not paid anything toward [Plaintiffs'] defense of the Garibaldi Action or the settlement of the bad faith action." (PSOF ¶ 88; DRSOF ¶ 88.)

### D.    Procedural Background

Plaintiffs bring five causes of action against Defendant: (1) breach of contract as to the Garibaldi Claim ("Count One"); (2) contractual indemnification as to the Garibaldi claim ("Count

Two"); (3) breach of contract as to the Jervis Claim ("Count Three"); (4) contractual indemnification as to the Jervis Claim ("Count Four"); and (5) declaratory judgment as to indemnification on the Jervis Claim ("Count Five"). (Compl. ¶¶ 80-118, ECF No. 1.) Following the close of fact discovery, Defendant filed its motion for partial summary judgment on Counts Three, Four, and Five of Plaintiffs' Complaint. (Def.'s Mot. for Summary J., ECF No. 104.) Plaintiffs opposed (Pls.' Opp'n Br., ECF No. 106) and Defendant replied (Def.'s Reply Br., ECF No. 114). Plaintiffs also moved for summary judgment on all of their claims against Defendant. (Pls.' Mot. for Summary J., ECF No. 130.) Defendant opposed Plaintiffs' Motion (Def.'s Opp'n Br., ECF No. 131) and Plaintiffs replied (Pls.' Reply Br., ECF No. 133). The motions for summary judgment are now ripe for resolution.

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, U.S. 242, 247-48 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a summary judgment motion, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 247-48; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which the nonmoving party must rely to support its assertion that genuine disputes of material fact exist). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . 'there can be no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a summary judgment motion, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249-50. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

## III.    DISCUSSION

Defendant moves for summary judgment on Counts Three, Four, and Five of Plaintiffs' Complaint, which all relate to the Jervis Claim. (*See generally* Def.s' Moving Br., ECF No. 104-1.) Plaintiffs move for summary judgment on all their claims. (*See generally* Pls.' Moving Br., ECF No. 130-1.) The Court will first turn to the arguments in support of Defendant's motion.

### A.    Defendant's Partial Motion for Summary Judgment

#### 1.    *Whether Defendant's "failure" to settle the Jervis Claim for policy limits was due to conditions in a settlement demand beyond its control*

Defendant argues that under Georgia law, "if an insurer faces conditions in a settlement demand that are beyond its control, then the insurer can 'create a safe harbor from liability for an insured's bad faith claim' by 'meeting the portion of the demand over which it has control.'" (Def.'s Moving Br. 13 (quoting *Cotton States Mut. Ins. Co. v. Brightman*, 580 S.E.2d 519, 522 (Ga. 2003)).) Defendant maintains that an "insurer is entitled to a safe harbor from liability if it responds to the settlement condition beyond its control simply by offering its policy limits." (*Id.* (citation modified) (quoting *Fortner v. Grange Mut. Ins.*, 686 S.E.2d 93, 95 (Ga. 2009)).) Defendant contends that "a settlement of the Jervis Claim for policy limits was not reached because of conditions *beyond the control* of [Plaintiffs] or ACM." (*Id.* at 14 (emphasis in original).) Specifically, because Amos refused to sign the affidavits the settlement condition was beyond its control. (*Id.* at 14-17.)

Plaintiffs argue, among other things that: (1) ACM did not raise the 'safe harbor' defense when it was handling the Jervis Claim; (2) the settlement failed because of requirements within ACM's control; and (3) the material facts do not support the contention that ACM "did everything 'within its control' to effectuate the settlement for $25,000" because ACM knew "for eighteen months that Jervis would require an [a]ffidavit from Jonathan . . . ." (Pls.' Opp'n Br. 17-34.)

12

The Court finds that there are disputed facts as to whether the settlement failed because of conditions that were within or beyond ACM's control. It is undisputed that the settlement agreement was not accepted because the signed affidavit was not obtained prior to the thirty-day settlement demand limit. (DSOF ¶¶ 47-48; PRSOF ¶¶ 47-48.) ACM argues that the cause of the affidavits not being signed was the Amoses' refusal to sign them. (*See* Def.'s Moving Br. 14-17.)

Plaintiffs contend that ACM knew "for eighteen months that Jervis would require an [a]ffidavit from Jonathan" to settle the Jervis Claim but failed to: (1) contact Jonathan directly to discuss the affidavit; (2) advise Plaintiffs that their insured was refusing to sign the affidavit before the time limited settlement demand expired; and (3) advise Amos or Jonathan about the time-limited demand or deadline to respond. (Pls.' Opp'n Br. 22-24.)

The time-limited demand was received by ACM on February 20, 2019. (DSOF ¶ 28; PRSOF ¶ 28.) In an effort to obtain the affidavits of no additional insurance, ACM called Amos on February 21, 2019, and left her a voice message. (DSOF ¶ 29; PRSOF ¶ 29.) That same day, ACM mailed Amos a letter "enclosing two standard affidavits of no additional insurance [and] request[ed], in bold font, that the affidavits be signed and returned." (DSOF ¶ 29; PRSOF ¶ 29.) Then, on March 22, 2019, "the last day of the [thirty]-day time-limited demand[,]" ACM's investigator visited Amos at her home in an attempt to obtain the signed affidavits of no additional insurance. (DSOF ¶ 35; PRSOF ¶ 35.) Amos informed the investigator that she had already received the requested affidavits but that she "refused to sign" them. (DSOF ¶ 35; PRSOF ¶ 35.) Three days later, ACM called Amos on a new phone number provided by its investigator and documented that during that call, Amos became "belligerent[.]" (DSOF ¶¶ 36-37; PRSOF ¶¶ 36-37). Although Jonathan was not the policy holder, there is no evidence that ACM ever made an attempt to contact Jonathan. (*See* DSOF ¶¶ 28-37; PRSOF ¶¶ 28-37.)

Here, a reasonable juror could find that ACM should have done more in an attempt to get Jonathan to sign the Affidavit when Amos refused to do so. (*See* DSOF ¶¶ 28-37; PRSOF ¶¶ 28-37.) A reasonable juror could also find that ACM should have made additional attempts to contact Amos before the deadline of March 22, 2019. (*See* DSOF ¶¶ 28-37; PRSOF ¶¶ 28-37.) Additionally, although after the deadline, Amos eventually delivered an affidavit of no additional insurance signed by her son. (DSOF ¶ 37; PRSOF ¶ 37.) There is, accordingly, a dispute of fact as to whether or not obtaining the affidavit after the time-limited demand ended was truly beyond the control of ACM. Such disputes are better left to a jury to decide and preclude summary judgment on the issue. *Roberts v. Auto-Owners Ins. Co.*, 677 F. Supp. 3d 316, 323 (W.D. Pa. 2023) (noting that "disputed issues of fact are proper for consideration by a jury[] and not . . . the [c]ourt"); *Hagan v. Stein*, No. 22-868, 2024 WL 3361631, at *5 (M.D. Pa. July 9, 2024) (finding that "the presence of disputed facts . . . should be resolved by a jury and not th[e] [c]ourt on summary judgment").

### 2.    *Whether Plaintiffs failed to mitigate their alleged damages*

In the alternative, Defendant argues that a non-breaching party has an obligation to mitigate damages once the offending party has materially breached its agreement. (Def.'s Moving Br. 17-18.) Defendant contends that Plaintiffs failed to mitigate their damages by allowing the $2 million settlement demand to lapse without a response. (Def.'s Moving Br. 17-20.)

Plaintiffs argue in opposition that they were not required to settle the Jervis Claim for $2 million in order to fulfill their obligation to mitigate their damages because when the demand was made on August 29, 2019, they were "in the process of preparing a motion to enforce the settlement for $25,000, which was filed on September 9, 2019." (Pls.' Opp'n Br. 34-39; DSOF ¶¶ 40, 43;

PRSOF ¶¶ 40, 43.) Plaintiffs maintain that the motion was reasonable because, although it was overturned on appeal, the Georgia trial court granted it. (DSOF ¶¶ 45-48; PRSOF ¶¶ 45-48.)

Viewing the dispute in the light most favorable to Plaintiffs and based on the fact that the Georgia trial court found in favor of Plaintiffs that the Amoses entered into a binding settlement agreement for the policy limits, the Court finds that there is a genuine dispute of fact about the reasonableness of Plaintiffs not settling for $2 million. (*See* DSOF ¶¶ 40-48; PRSOF ¶¶ 40-48.) Moreover, because the Court found that there was a dispute of fact as to whether Defendant was responsible for the time-limited settlement agreement not being finalized, and thus required to indemnify Plaintiffs, a determination of whether Plaintiffs were required to mitigate their damages is premature. *Bral Corp. v. Johnstown Am. Corp.*, No. 08-232, 2013 WL 398149, at *8 n.12 (W.D. Pa. Jan. 31, 2013) (finding that any determination regarding damages was premature prior to a finding that there was a breach).

The Court, accordingly, denies Defendant's partial motion for summary judgment.

### B.    Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment on all their claims. (*See generally* Pls.' Moving Br.) In doing so, Plaintiffs argue that the Master Contract requires ACM to indemnify Plaintiffs for the settlements reached on the Garibaldi and the Jervis Claims. (Pls.' Moving Br. 19-20.) The Master Contract[1] contains the following indemnification provision:

---

[1] The Master Contract is governed by Delaware law. (PSOF ¶ 8; DRSOF ¶ 8; Defs.' Moving Br. 13 ("The parties' Master Contract is to be governed by and interpreted in accordance with the laws of the State of Delaware."); Pls.' Opp'n Br. 5 (same).) Pursuant to Delaware law, courts do "not look beyond the four corners of an unambiguous document." *Techno-X USA Inc. v. Spartan Forge LLC*, No. 24-1313, 2025 WL 1625387, at *4 (Del. Ch. June 9, 2025).

> [ACM] shall indemnify, defend and hold [Plaintiffs] harmless from and against any liability, damages, disputes, claims, demands or actions, including litigation or arbitration ("Loss") arising from the *negligent acts or omissions* of [ACM] or its officers, agents, servants, employees, associates, representatives, or subcontractors in the connection with services provided or performance under this Agreement, unless the specific act or omission occurred at the express written direction of [Plaintiffs].

(PSOF ¶ 7 (emphasis added); DRSOF ¶ 7.)

Plaintiffs argue that *Pike Creek Chiropractic Center, P.A. v. Robinson*, 637 A.2d 418 (Del. 1994) and *Bainville v. Hess Oil Virgin Islands Corporation*, 837 F.2d 128 (3d Cir. 1988) are controlling and require Defendant to indemnify Plaintiffs. (Pls.' Moving Br. 21-25.) Defendant argues in opposition that both cases are inapposite because they both involved broad indemnification provisions that did not reference any negligence on the part of the indemnitor. (Def.'s Opp'n Br. 19-21.) Plaintiffs also argue that they need only show potential liability to be indemnified. (Pls.' Moving Br. 20-25.) Plaintiffs contend that the indemnification provision of the Master Contract contains no requirement of a judicial finding of negligence to trigger AMC's indemnity obligations. (*Id.*)

The indemnity clause in *Pike Creek* read:

> The Employee [the defendant] shall hold the Employer [the plaintiff] harmless and indemnify the Employer, its successors and assigns, against any liabilities and expenses, including attorney's fees which result from *any acts and [omissions]* of the Employee.

*Pike Creek*, 637 A.2d at 419-20 (emphasis added). Notably different to the indemnification provision at issue here, the indemnification provision in *Pike Creek* provided that the indemnitor will be responsible for "any acts or [omissions,]" with no qualification as to the indemnitor's negligence. *Id.*

16

Similarly, the indemnification provision in *Bainville* read that the indemnitor must:

> indemnify, exonerate, and hold harmless [the indemnitee] against loss, damage, liability or expense by reason of any suits, claims, demands, judgments or causes of action for personal injury (including death) or property damage (including property of the parties) arising out of *or in any way in consequence of the performance hereunder by [indemnitor]* except that in no instance shall [indemnitor] be held responsible for any liability, claim, demand or cause of action attributable solely to the negligence of [indemnitee].

*Bainville*, 837 F.2d at 129 (emphasis added). Like *Pike Creek*, the indemnification provision in *Bainville* provided that the indemnitor was required to indemnify the indemnitee for actions "arising out of or *in any way in consequence of the performance* hereunder by [indemnitor,]" with no qualification as to the indemnitor's negligence. *Id.* Here, conversely, Defendant is only responsible for the indemnification of Loss "arising from the negligent acts or omissions" of Defendant. (PSOF ¶ 7; DRSOF ¶ 7.)[2] While Plaintiffs are correct that there does not need to be an explicit finding of negligence to trigger the provision, Defendant is only required to indemnify Plaintiffs for its own negligent acts or omissions. (PSOF ¶ 7; DRSOF ¶ 7.) To be sure, here, unlike

---

[2] Pursuant to Delaware law, where a "contract is unambiguous, [c]ourt[s] give[] effect to the plain meaning of the contract's terms." *Active Day OH, Inc. v. Wehr*, No. 08-64, 2024 WL 3201167, at *3 (Del. Super. Ct. June 27, 2024). "A contract is unambiguous when 'a reasonable person in the position of either party would have no expectations inconsistent with the contract language.'" *Id.* (citation omitted). "Disagreement among the parties as to the meaning of the contract does not . . . mean that the contract is ambiguous." *Id.* Here, the Court finds that the indemnity provision is unambiguous. *Washington House Condo. Ass'n of Owners v. Daystar Sills, Inc.*, No. 15-1108, 2018 WL 6046714, at *5 (Del. Super. Ct. Nov. 13, 2018) (finding terms of indemnification provision unambiguous where it provided that a subcontractor would indemnify a contractor for the "negligent acts or omissions" of the subcontractor). While Plaintiffs are correct that the indemnification provision broadly covers all types of Loss including "against *any* liability, damages, disputes, claims, demands or actions, including litigation or arbitration[,]" that broad language is qualified by the fact that those types of Losses are only subject to indemnification if they "aris[e] from the *negligent acts or omissions* of [ACM]." (SOF ¶ 7; DRSOF ¶ 7.) This is a key difference between this case and *Pike Creek* or *Bainville*, each of which did not require the indemnitors' acts or omissions to be negligent. *See Pike Creek*, 637 A.2d at 419-20; *Bainville*, 837 F.2d at 129.

in *Pike Creek* and *Bainville*, Defendant is *not* required to indemnify Plaintiffs for *any acts or omissions* but *only* those acts or omissions of Defendant's *that were negligent*. (SOF ¶ 7; DRSOF ¶ 7.)

The situation here is distinguishable from *Pike Creek* and *Bainville*. Here, the underlying suits did not involve ACM. The underlying suits involved: (1) Jonathan's conduct, which allegedly caused Jervis's injuries (PSOF ¶¶ 11, 13; DRSOF ¶¶ 11, 13); and (2) Garibaldi's alleged workplace injuries. (PSOF ¶¶ 64-68; DRSOF ¶¶ 64-68.) Neither of these underlying suits—Jervis's injuries from the accident, or Garibaldi's alleged workplace injuries—were caused, in the first instance, by ACM or ACM's negligence. (*See generally* PSOF; DRSOF.) As discussed above in the context of Defendant's motion, there is a dispute of fact as to whether the need for settlement was caused by ACM's mishandling of the Jervis Claim or whether it was caused by the Amoses not signing the affidavits of no additional insurance. Because the indemnification provision requires ACM to indemnify Plaintiffs only for disputes arising out of ACM's *negligent acts or omissions* there is, accordingly, a dispute of fact as to whether ACM was required to indemnify Plaintiffs for its handling of the Jervis Claim. Moreover, a reasonable jury could find that ACM's denial of Garibaldi's "loss income benefits" was not negligent. (*See, e.g.*, PSOF ¶ 74 (explaining that ACM's claim adjuster "determined that Garibaldi was not entitled to any loss income benefits"); DRSOF ¶ 74; PSOF ¶ 71 (explaining that ACM's adjuster "did not agree with" the treating doctor's "decision to take Garibaldi off work and declined to pay loss income benefits"; DRSOF ¶ 71 (denying as stated and explaining that: (1) the adjuster "had 'legitimate concerns about the reliability'" of the treating doctor's report; (2) "Garibaldi was not 'complying with [the adjuster's] requests'" for information; (3) the adjuster consulted with a colleague after receiving the treating doctor's report; and (4) "in light of these legitimate concerns," the adjuster "order[ed] an

18

Independent Medical Examination"); PSOF ¶ 75 (discussing the ICA's awarding benefits to Garibaldi); DRSOF ¶ 75 (explaining that "prior to the ICA's decision, [Plaintiffs] had an opportunity to settle the Garibaldi claim . . . for $70,000" an amount that "exceeded ACM's authority" to settle, but that Plaintiffs declined to do so "[a]fter reviewing the medical reports and ACM's claim files").) Again, because the indemnification provision requires ACM to indemnify Plaintiffs only from disputes arising out of ACM's *negligent acts or omissions* there is, accordingly, a dispute of fact as to whether ACM was required to indemnify Plaintiffs for its handling of the Garibaldi claim.

The Court therefore finds that there is a dispute of fact as to whether the settlements of the Jervis and Garibaldi Claims above policy limits were due to Defendant's negligent acts or omissions, and a reasonable juror could find that they were not. As such, summary judgment is not appropriate. *See 18W Holdings, Inc. v. Sing for Serv., LLC*, 763 F. Supp. 3d 651, 654 (D.N.J. 2025) (explaining that summary judgment is not appropriate where "a reasonable jury could return a verdict for the nonmoving party" (quoting *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203-04 (3d Cir. 2022)); *In re SoClean, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 22-152, 2025 WL 974829, at *10 (W.D. Pa. Mar. 20, 2025) ("If a reasonable jury could return a verdict for the nonmoving party, summary judgment may not be granted." (citation omitted)).

The Court therefore denies Plaintiffs' Motion for Summary Judgment.[3]

---

[3] Because the Court determined that there are disputes of fact as to whether ACM was required to indemnify Plaintiffs for the Garibaldi and Jervis' Claims, the Court finds that Plaintiffs' argument that ACM is precluded from challenging the reasonableness of Plaintiffs' settlement of the Garibaldi and Jervis' Claims because ACM refused to accept Plaintiffs' tenders for defense and indemnification is premature. *See Woolley v. Groft*, 653 F. Supp. 3d 171, 186 (M.D. Pa. 2023) (denying summary judgment as "premature" where "the underlying issue of breach . . . remain[ed] unresolved"). The same is so as to Plaintiffs' argument that they are entitled to attorneys' fees.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Partial Motion for Summary Judgment and Plaintiffs' Motion for Summary Judgment are denied. The Court will issue an order consistent with this Memorandum Opinion.

/s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

DATED: APRIL 30, 2026